UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO. 3:16-cv-01283-HES-PDB

LANDON L. WILLIAMS,

                Plaintiff,

v.

NATIONSTAR MORTGAGE, LLC,
FIELD ASSET SERVICES, LLC,
MARK A. SOLOMON and DUSTEN
DYSON,

                Defendants.
_____/

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff, Landon L. Williams, by and through undersigned counsel, and sues Defendants Nationstar Mortgage, LLC, Field Asset Services, LLC, Mark Solomon, and Dusten Dyson (collectively "Defendants"), and in support thereof alleges the following:

## INTRODUCTION

1.     Plaintiff sues Defendant Nationstar Mortgage, LLC ("Nationstar"), for damages and to enjoin Nationstar's practice of making unsolicited phone calls to Plaintiff's cellular and landline telephones without Plaintiff's consent and with the use of an automatic telephone dialing system and/or pre-recorded voice in violation of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227.

2.     Plaintiff sues Defendants, Nationstar, Field Asset Services, LLC ("FAS"), Mark A. Solomon ("Solomon"), and Dustin Dyson ("Dyson"), for damages resulting from trespass, theft, conversion, intrusion upon seclusion, breach of contract, negligence, violations of the Florida Deceptive and Unfair Trade Practices Act, and 42 U.S.C. § 1981.  Additionally, Plaintiff seeks an accounting of his mortgage while serviced by Defendant Nationstar.

3.     Plaintiff's non-TCPA claims stated herein stem from the damage, destruction, theft, conversion, and the illegal entry upon Plaintiff's real property by the Defendants without Plaintiff's authorization or consent.

4.     Part I of this Second Amended Complaint addresses Nationstar's violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, through its repeated and unsolicited telephone calls to Plaintiff's cellular and landline telephones.

5.     By making the telephone calls at issue in this Complaint, Nationstar caused actual harm to Plaintiff.

6.     Nationstar routinely made and makes said telephone calls despite the fact that Plaintiff never provided consent to be called on the specific telephone numbers that the Nationstar actually called, and Plaintiff never provided consent to be called by an automatic telephone dialing system or a prerecorded voice.

7.     In response to Nationstar's unlawful conduct, Plaintiff brings the instant lawsuit seeking an injunction requiring Nationstar to cease all unsolicited telephone calling activities and awarding Plaintiff statutory damages against Nationstar under the TCPA, together with costs and reasonable attorney's fees.

8.      Part II of this Second Amended Complaint discusses Plaintiff's claims against the Defendants for damages resulting from trespass, theft, conversion, intrusion upon seclusion, violation of Florida's Deceptive and Unfair Trade Practices Act, negligence, breach of contract, violation of 42 U.S.C. § 1981, and lastly, Plaintiff's demand for an accounting from Defendant Nationstar.

## JURISDICTION, VENUE & PARTIES

9.      Plaintiff Landon L. Williams ("Plaintiff") resides within the Middle District of Florida, he is and was a citizen of Florida at all times material to the allegations herein, he is an American citizen of African descent, and he is a disabled American.   Plaintiff owned a home with a mortgage serviced by Defendant Nationstar from 2011 to February 2017.

10.     Defendant Nationstar Mortgage, LLC ("Nationstar"), is a Delaware corporation with its principal place of business in Texas.   Nationstar does business and holds and services mortgage loans throughout the United States, including the State of Florida and in the Middle District of Florida.   Nationstar has repeatedly engaged in the wrongful conduct described herein within the State of Florida, including the Middle District of Florida.

11.     Defendant Field Asset Services, LLC ("FAS"), is a Delaware corporation with its principal place of business in Texas.   FAS is a foreign corporation authorized to do business in the State of Florida and does business and is in the business of property preservation and enforcing security interests for companies that provide mortgage financial services to Florida residents.

12. Defendant Mark A. Solomon ("Solomon") is an individual related to FAS as either a contractor of FAS or a direct hire of FAS. According to the Daytona Beach Police, Solomon is a resident of Daytona Beach, Florida. Plaintiff is suing Solomon individually and/or in his official capacity. Solomon is in the business of property preservation and enforcing security interests for companies that provide mortgage financial services to Florida residents.

13. Defendant Dusten Dyson ("Dyson") is an individual related to FAS as either a contractor of FAS or a direct hire of FAS. According to the Daytona Beach Police, Dyson is a resident of Port Orange, Florida. Plaintiff is suing Dyson individually and/or in his official capacity. Dyson is in the business of property preservation and enforcing security interests for companies that provide mortgage financial services to Florida residents.

14. Venue is proper pursuant to 28 U.S.C. § 1391 as Plaintiff resides within the Middle District of Florida, the subject property to this action is located within the Middle District of Florida, and a substantial part of the events or omissions giving rise to the claims occurred within the Middle District of Florida and Volusia County.

15. Jurisdiction is proper under 28 U.S.C. § 1331, federal question jurisdiction, as the action arises under the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227.

16. Alternatively, jurisdiction is proper under 28 U.S.C. § 1343.

17. Moreover, jurisdiction is proper over Plaintiff's state law claims against Defendants pursuant to 28 U.S.C. § 1367 as such claims are related to the claims under this Court's original jurisdiction.

18. In *Wright, et al. v. Nationstar Mortgage LLC*, No. 14-cv-10457, Nationstar is a defendant in a lawsuit for placing autodialed and prerecorded calls to consumers' cellular telephones without said consumers' consent. The lawsuit alleges that Nationstar violated the Telephone Consumer Protection Act because consumers did not consent to receiving these telephone calls. Nationstar denies the allegations, denies that it violated any law, and contends that it acted with the consumers' consent. The court decided that a settlement of the *Wright* lawsuit would include a class of "all individuals in the United States for whom Nationstar Mortgage had in its records a cellular telephone number, as of October 14, 2015." However, no court has determined the merits of such action as the parties to the *Wright* litigation appear to have entered into a settlement agreement in order to avoid time-consuming and expensive litigation.

19. Plaintiff was identified as an eligible class member who was materially and irreparably harmed by Nationstar's intentional violation of the Telephone Consumer Protection Act in *Wright, et al. v. Nationstar Mortgage LLC*.

20. Through the *Wright* federal class action lawsuit, Plaintiff Landon L. Williams timely exercised his right to seek a private federal action against Nationstar Mortgage, LLC, by submitting an "opt-out" letter to the class action administrator via United States Postal Service first class certified mail, thereby allowing

Plaintiff Landon L. Williams to proceed individually against Defendant Nationstar for violation(s) of both federal and any State of Florida consumer protection law.

## GENERAL ALLEGATIONS: PART I

21.     The Telephone Consumer Protection Act  ("TCPA") was passed by the United States Congress in 1991 and is codified as 47 U.S.C. § 227.  The TCPA limits the use of automatic telephone dialing systems, artificial or pre-recorded voice messages, SMS text messages, and faxes.

22.     Specifically, with respect to calls made to cellular telephones, the TCPA prohibits the use of any automated telephone dialing system or any artificial or prerecorded voice unless the recipient expressly consents to the receipt of such calls on the recipient's cellular telephone.

23.     With respect to calls made to residential telephones, the TCPA prohibits the use of any artificial or prerecorded voice to deliver a message unless the recipient expressly consents to the receipt of such calls on the recipient's residential telephone.

24.     According to the Federal Communications Commission—the agency tasked with promulgating the implementing regulations of the TCPA—to be considered "express consent," such consent must: (i) be in writing; (ii) be signed by the person providing the consent; (iii) specify the telephone number to which the person is consenting to be called; and (iv) clearly authorize the calling party to use an automated dialing system or prerecorded voice.  *See In the Matter of Rules and*

6

*Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC Report and Order, CG Docket No. 02-278 (Feb. 15, 2012) ¶ 33, Appendix A, at 34.

25. Nationstar is a "non-bank residential mortgage servicer" that provides "a range of services across the residential mortgage product spectrum." In general, a mortgage servicer is a third party that is hired by an investor or owner of a loan to perform the mortgage servicing function with respect to a loan or group of loans (called a portfolio). Mortgage servicers send out bills, collect payments, allocate the monies collected in accordance with the servicing agreement, calculate escrow, and, in certain circumstances, engage in loss mitigation efforts and foreclosure and foreclosure alternatives.

26. Nationstar placed repeated telephone calls to Plaintiff and other consumers who never provided Nationstar (or any third party associated with the mortgage) with prior express consent to call their telephone numbers.

27. Nationstar's calls are made for the purpose of collecting alleged debts, to purportedly "remind" the Plaintiff and other consumers to pay their mortgages, and for potentially other, non-debt collection reasons.

28. Nationstar made telephone calls to Plaintiff on a daily basis and often, multiple times per day, seven days a week.

29. In making the calls at issue in this Second Amended Complaint, Nationstar and/or its agents use an automatic telephone dialing system ("ATDS"). Specifically, the hardware and software used by Defendant and/or its agents has the capacity to

generate and store random numbers, or receive and store lists of telephone numbers, and to dial those numbers, en masse, in an automated fashion without human intervention. The automated dialing equipment also is, or includes features substantially similar to, a predictive dialer, which means that it is capable of making numerous phone calls simultaneously and automatically connecting answered calls to then available callers or recordings and disconnecting the rest of the calls (or placing them on hold). Accordingly, consumers receiving calls from Nationstar and/or its agents are frequently confronted with dead air or the sound of the call being disconnected (otherwise known as an "abandoned call").

30.     Nationstar admits that it has been using predictive dialing technology since at least as early as 2012. In Nationstar's Form S-1, dated February 24, 2012, Nationstar states, "[i]n the account resolution group, we use a combination of predictive dialer technology and account level assignments to contact the borrowers."

31.     Nationstar's particular automated telephone dialing system is known as the "Avaya Proactive Contact" system. According to Avaya Inc., the "Avaya Proactive Contact" system is a "predictive dialing system" that uses "the most advanced dialing algorithms available to optimize your outbound communication campaigns." In particular, the "Avaya Proactive Contact" system enables Nationstar to "set up campaigns and manage multiple dialers across [its] organization…[and to] define and manage various outbound campaigns for marketing, sales and accounts payable all from a single system."

32.   According to Avaya Inc., the "Avaya Proactive Contact" system is built with several features that enable Nationstar to "comply with even the most restrictive regulations."  Despite having this capability, however, Nationstar does not utilize the compliance functionality of its "Avaya Proactive Contact" system to ensure that the company is "adhering to strict regulatory compliance."   Instead, Nationstar routinely violates the TCPA by using its "Avaya Proactive Contact" system to call Plaintiff's and other mortgagors' telephones without having obtained the relevant and required express consent to do so.

33.   In the *Wright* federal class action litigation, Nationstar's records contain evidence of the fact that Nationstar repeatedly violated the TCPA by using its "Avaya Proactive Contact" automated telephone dialing system to call class members' telephones without having obtained the class members' express consent to do so. For example, Nationstar's records identify the exact date and time of each and every call made by Nationstar and whether the call was made by Nationstar's "Avaya Proactive Contact" automated telephone dialing system.  The specific calls that were made by Nationstar's "Avaya Proactive Contact" automated telephone dialing system are identified within Nationstar's records by the labels "AVAYA," "PRE RECORDED DIALER MESSAGE," "PRDM," "CALL ANSWERED NO POSITIVE VOICE ID DETECTED," or "CALL DROPPED FROM DIALER HOLD, NO AGENT AVAIL."

34.   Nationstar's calls to cellular and residential landline phones also feature artificial or pre-recorded messages instead of live operators.

35.   Making Nationstar's calls all the more problematic, the pre-recorded messages do not and did not provide Plaintiff with an option to stop the calls. To speak with a live operator and request that the calls stop, Plaintiff and any other affected consumer must provide personally identifying information such as a social security number.

36.   This barrier is particularly problematic because Nationstar places unwanted telephone calls to consumers who do not have a mortgage with or are not serviced by Nationstar.

37.   Even when consumers such as Plaintiff were called and connected to a live operator—and even when such consumer makes explicit written and verbal requests to Nationstar to stop sending the harassing and intimidating telephone calls—the calls continued in direct contravention to said requests.

38.   Nationstar was and is aware that the above described telephone calls are and were being made to Plaintiff without the prior express consent to receive said telephone calls.  Nationstar did not have the express written consent to contact Plaintiff at any time under Federal law. Moreover, any possible express written consent as alleged by Nationstar was revoked in writing by Plaintiff prior to any calls made to him during the time period.

39.   Complaints regarding Nationstar's conduct have not been limited to Internet postings.  In fact, Nationstar has been sued multiple times in various jurisdictions in individual federal civil action actions for violating the TCPA by routinely placing calls with an automated telephone dialing system or prerecorded voice to

Plaintiff and separate class members' phones from the *Wright* litigation without the required express consent.

40. The fact that Nationstar has been sued numerous times in individual actions based on the fact that Nationstar has routinely placed calls with an automated telephone dialing system or prerecorded voice to cellular and residential phones without the express consent to do so very clearly demonstrates that Nationstar's continued violation of the TCPA is "knowing" and "willful."

**FACTUAL ALLEGATIONS REGARDING PLAINTIFF: PART I**

41. Nationstar serviced Plaintiff's Mortgage from 2011 to February 2017.

42. Since at least August 2011, Nationstar has placed numerous telephone calls to Plaintiff's residential phone without having obtained Plaintiff's express consent.

43. Plaintiff has received the aforementioned telephone calls from telephone numbers, including 888-811-5279, 888-480-2432, and other toll-free numbers emanating from the State of Texas.  These telephone numbers belong to and connect directly to Defendant Nationstar Mortgage, LLC.

44. Each of these telephone calls was initiated with an ATDS and a pre-recorded voice.  Each of the telephone calls were made to "remind" Plaintiff to pay his mortgage, even though Plaintiff demanded via telephone and in writing that Nationstar stop making such harassing and intimidating daily telephone calls.

45. Astoundingly, Plaintiff has received at least over ***four hundred (400)*** separate telephone calls from Nationstar Mortgage, all made with an ATDS and a pre-recorded voice, since August of 2011.

46.     Plaintiff never consented to receiving said telephone calls on his cellular phone.

47.     Nationstar was also fully aware that the above described telephone calls were being made to Plaintiff's residential telephone number without his prior express consent to receive them, to which Plaintiff never consented.

48.     Nationstar's actions in making the above described telephone calls to Plaintiff's cellular and landline telephone numbers without Plaintiff's express consent are evidence of Nationstar's determination to intimidate, harass, and terrorize Plaintiff as part of Nationstar's illegal mortgage foreclosure servicing activities.

## COUNT I:  VIOLATION OF THE TCPA, 47 U.S.C. § 227
### (Against Nationstar)

49.     Plaintiff incorporates the foregoing allegations in ¶¶ 1-48 by reference.

50.     Defendant Nationstar made, or directed to be made, unsolicited telephone calls to cellular and landline telephone numbers belonging to the Plaintiff without his prior express consent to receive such calls.

51.     Nationstar and/or its agents made the telephone calls (1) using equipment that had the capacity to store, generate, or produce telephone numbers to be called using a random or sequential number generator, and/or receive and store lists of phone numbers, and to dial such numbers, en masse, and/or (2) using a prerecorded or artificial voice.

52.     Nationstar used equipment that made, or had made on its behalf, the telephone calls to Plaintiff and other consumers simultaneously and without human intervention.   Specifically, Nationstar uses an Avaya predictive dialer and

telephone system, among potentially other brands of automatic telephone dialing systems.

53.     By making, or having made on its behalf, the unsolicited telephone calls to Plaintiff's cellular telephone without Plaintiff's prior express consent, and by using an ATDS or pre-recorded voice to make those calls, Nationstar has violated 47 U.S.C. §§ 227(b)(1)(A)(iii) and 227(b)(1)(B).

54.     Furthermore, on two separate occasions in 2013, Nationstar physically broke into Plaintiff's home as further proof of Nationstar's determination to intimidate, harass, and terrorize Plaintiff as a part of Nationstar's illegal mortgage servicing and collection activities.

55.     As a result of Defendant's unlawful conduct, Plaintiff has suffered injury in fact. Specifically, Plaintiff has suffered invasion of privacy and quiet enjoyment, compensatory damages, including $500 in statutory damages for each such violation of the TCPA, pursuant to § 227(b)(3)(B), plus injunctive relief to stop the calls.    The damages suffered by Plaintiff are fairly traceable to the Defendant's unlawful conduct.

56.     Plaintiff's injuries in fact are likely to be redressed by a favorable judicial decision.  Should the Court determine that Nationstar's conduct was willful and knowing, the Court may, pursuant to section 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff.

**WHEREFORE**, Plaintiff individually prays for the following relief:

a.   An award of actual and statutory damages;

b.  An award of nominal damages for violation of Plaintiff's rights.

c.  Treble statutory damages for Nationstar's willful and knowing conduct;

d.  An injunction requiring Defendant Nationstar Mortgage, LLC, to cease all unsolicited telephone calling activities upon Plaintiff;

e.  Any other and further relief that the Court deems reasonable and just.

## GENERAL ALLEGATIONS: PART II

57.  Nationstar Mortgage, LLC had a consensual, agency relationship with Field Asset Services, LLC, Mark A. Solomon, and Dustin Dyson whereby Nationstar (as the principal) had the right to control the activities of FAS, Solomon, and Dyson (as the agents) and FAS, Solomon, and Dyson had the authority to act on behalf of Nationstar.

58.  Nationstar had the right to control the manner and method in which FAS, Solomon, and Dyson came in contact with, entered, and altered the subject property at issue in this action.

59.  FAS had a consensual, agency relationship with Solomon and Dyson, whereby FAS (as the principal) had the right to control the activities of Solomon and Dyson (as the agents), and Solomon and Dyson had the authority to act on behalf of FAS.

60.  FAS had the right to control the manner and method in which Solomon and Dyson came in contact with, entered, and altered the subject property.

14

61.   Solomon had a consensual, agency relationship with Dyson whereby Solomon (as the principal) had the right to control the activities of Dyson (as the agent), and Dyson had the authority to act on behalf of Solomon.

62.   Solomon had the right to control the manner and method in which Dyson came in contact with, entered, and altered the subject property.

63.   Solomon as the principal of Dyson is liable for the acts of Dyson.

64.   FAS, as the principal of Solomon and Dyson, is liable for the acts of Solomon and Dyson.

65.   Nationstar as the principal of FAS, Solomon, and Dyson is liable for the acts of FAS, Solomon, and Dyson.

66.   Nationstar, FAS, Solomon, and Dyson are liable for any activity that was conducted at the subject property by subcontractors acting on their behalf, as their agent, under their supervision, and/or at their direction.

## **FACTUAL ALLEGATIONS REGARDING PLAINTIFF: PART II**

67.   On February 26, 2007, Plaintiff executed a mortgage and note (the "subject loan") in favor of SunTrust Mortgage, Inc., in the amount of $116,800.00, for the purchase of Plaintiff's property and home, located at 836 Vernon Street, Daytona Beach, Florida 32114 (the "subject property").

68.   Plaintiff has resided continuously at the subject property, without interruption, since closing on his residential home purchase on February 26, 2007.

69.   At some point after its origination, Nationstar purportedly acquired the servicing rights and ownership of the subject loan.

70.    On August 31, 2012, Plaintiff's 3-year State of Florida non-renewable temporary educator's license expired.  As such, the Plaintiff could not continue teaching employment with Duval County Public Schools.

71.    Plaintiff also worked as a domestic violence Facilitator with Hubbard House, Inc. Based on the substantial decrease in Plaintiff's monthly income, effective September 1, 2012, Plaintiff contacted Defendant Nationstar Mortgage in August of 2012 in order to seek a modification of his mortgage payment.

72.    In August 2012, several Nationstar loan representatives assisted Plaintiff. Specifically, Nationstar's loan representatives included Allison Harass, who instructed Plaintiff that in order to receive a mortgage modification, Plaintiff "should miss three to four consecutive mortgage payments" in order to "show proof of a substantial hardship," which would thus qualify Plaintiff for a mortgage modification.   Subsequently, in early August of 2012, Plaintiff verified the material representations he relied upon from Allison Harass with Nationstar loan representatives Caroline Rich, Ms. Ijay Nkele and other Nationstar loan representatives.

73.    In August 2012, Plaintiff made full application for a mortgage modification with Nationstar, supplying Nationstar with employment, income, credit, and checking/savings account documentation.  At no point was Plaintiff's property abandoned.

74.   In Plaintiff's August 2012 application for a loan modification, Plaintiff attested under penalty of perjury that the subject property was his primary residence.  At all times material, Plaintiff did, in fact, reside at the subject property.

75.   Based Allison Harass' material representations, as well as material representations of other Nationstar loan representatives, including Caroline Rich, Ms. Ijay Nkele, and other Nationstar loan representative, Plaintiff did as he was instructed, and he did not make a mortgage payment beginning in the month of September, 2012.

76.   In February, 2013, Plaintiff received a denial letter from Nationstar regarding Plaintiff's August 2012 application for a loan modification.

77.   On its written Fair Credit Reporting Act/Notification of Credit Denial, Nationstar stated as its reason for Plaintiff's loan denial, "under Federal National Mortgage Association ("FNMA") guidelines an applicant is ineligible for a loan modification if only source of income is from part time employment."

78.   At the time Plaintiff applied via telephone for a mortgage modification with Nationstar, Plaintiff made it clear to Ms. Allison Harass, and every other Nationstar loan representative he spoke with, that he was employed part-time with Hubbard House, Inc., although Plaintiff earned a gross income in excess of $300 weekly from said employment.  Despite Plaintiff's clear notification to Nationstar regarding his employment, Nationstar took six (6) months to inform Plaintiff of his ineligibility for a loan modification due to his part-time employment.

79.   Subsequently, in or around February or March of 2013, Nationstar issued a work order directing Field Asset Services to facilitate debt collection and enforce the

17

subject mortgage by changing the locks and committing additional undertakings at the subject property.

80.     After receiving the work order from Nationstar, FAS initiated a process whereby various subcontractors bid to further facilitate debt collection and enforce the subject mortgage by changing the locks and committing additional undertakings at the subject property, as directed by Nationstar through FAS.

81.     Defendants Mark A. Solomon ("Solomon") and Dustin Dyson ("Dyson") won the bid to provide services for both Defendants FAS and Nationstar.

82.     After winning the bid, FAS initiated a process whereby more subcontractors bid to facilitate debt collection and enforce the subject mortgage by changing the locks and committing additional undertakings at the subject property, as directed by Nationstar and FAS.

83.     Mortgage Solutions, Inc. ("MSI") won the bid to provide services for Nationstar, FAS, Solomon, and Dyson (hereinafter FAS, Solomon, Dyson, and MSI will be collectively referred to as the "Service Providers").

     Defendants' Break-In to Plaintiff's Home on Sunday, April 28, 2013

84.     On Sunday morning, April 28, 2013, while Plaintiff was asleep in his bed, Defendants Mark A. Solomon and Dustin Dyson irreparably damaged Plaintiff's aluminum security door by breaking the lock and door handle in order to gain illegal entry and access to Plaintiff's home.

85.     Solomon and Dyson proceeded to use a drill and burglary tools to defeat the deadbolt on the Plaintiff's front door. The two men then irreparably damaged the

wooden frame on the front door by forcing the door open and splitting and drilling though the wood of the door frame around the deadbolt. Solomon and Dyson then proceeded to enter Plaintiff's home.

86.   At no time whatsoever did Solomon and Dyson ever knock on Plaintiff's aluminum security door or solid wood front door, either prior to or while forcing entry into Plaintiff's home on April 28, 2013.

87.   Plaintiff woke to what he believed was the sound of a drill inside his home. When Plaintiff leapt out of his bed in his underwear to see what was going on, he walked up his hallway to find Solomon standing in his foyer with his right hand in his pocket. Meanwhile, Dyson knelt in front of the solid wood front-door with a cordless drill in his hand.

88.   Plaintiff shrieked in fear and demanded that the two men immediately leave his home. Solomon and Dyson refused to leave. Solomon advised Plaintiff that his presence was "on behalf of the owner." Plaintiff notified Solomon that he *was* the owner and that he was calling the police.

89.   While Plaintiff was on the phone with the Daytona Beach Police Department ("DBPD"), Solomon and Dyson remained inside Plaintiff's house, refusing to leave. Solomon and Dyson did not leave until Plaintiff had no choice but to notify the two men that he would retrieve his firearm if they did not leave, to which Solomon instructed Dyson, "Let's go."

90.   As Solomon and Dyson left the premises of Plaintiff's property, Plaintiff instructed the two men to remain nearby as the police were on the way.

19

91.     DBPD Officer Todd Durleth promptly arrived at Plaintiff's home and obtained
        Solomon and Dyson's identification information.   Upon his preliminary
        investigation, Officer Durleth determined that the break-in was a "civil matter."
        DBPD Officer Durleth gave Plaintiff an incident number to reference in the event
        Plaintiff wanted to prosecute Solomon and Dyson, to which Plaintiff insisted he
        would.

92.     When Solomon and Dyson left the subject property, Plaintiff's aluminum front
        door was broken and the door frame was split at the deadbolt on Plaintiff's solid-
        wood front door.   Subsequently, Plaintiff discovered that during his sleep,
        Solomon and Dyson went inside Plaintiff's living room and posted two paper
        notifications on the inside window facing the yard, which stated Field Asset
        Services as the subject property's "contact for property management."

93.     On Monday, the following day, Plaintiff arrived to the DBPD Headquarters and
        filed a Complaint against Solomon and Dyson.   To Plaintiff's knowledge, no
        action was taken by the State Attorney's Office, nor did the DBPD take any
        action against Solomon and Dyson.

94.     To further add insult to injury, Nationstar subsequently tacked on an additional
        $380.00 to Plaintiff's mortgage balance on Plaintiff's May 2013 Statement,
        described as "Property Preservation" fees, which compensated the Service
        Providers for their illegal break-in to Plaintiff's home on April 28, 2013.

                    Defendants' Break-In to Plaintiff's Home on May 17, 2013

95.    On Friday morning, May 17, 2013, Defendants Solomon and Dyson returned to Plaintiff's home to break in *a second time*.

96.    Solomon and Dyson parked their moving truck in the front of Plaintiff's residence, met with Plaintiff's immediate neighbor, Ms. Mae Belle, and asked Ms. Belle, if Plaintiff regularly lived at his residence.

97.    Ms. Hancock informed Solomon that Plaintiff regularly resided at his home, and that Solomon would need to speak with Plaintiff if he had any other questions.

98.    The Service Providers then proceeded to Plaintiff's residence, forced the aluminum security door open, which previously damaged from the April 28, 2013 break-in, and forced entry to Plaintiff's residence by drilling through the deadbolt and forcing entry through the solid wooden door, which was already irreparably damaged from Solomon and Dyson's April 28, 2013 break-in.

99.    The Service Providers changed the deadbolt and handle on the Plaintiff's solid, wooden front door.

100.   Additionally, the Service Providers removed the deadbolts and handles from two solid-wood rear doors, damaged those door frames by drilling additional holes to install new deadbolt locks and handles on both doors, damaged the real estate and other personal property within, and stole Plaintiff's personal property from the subject property.

101.   The Service Providers stole the following items from the subject property:

a.    Plaintiff's circa 1991 Rolex stainless steel Datejust with jubilee bracelet;

b.    Plaintiff's 14K Scottish Rite 1 carat solitaire diamond ring;

21

c.  Plaintiff's Smith & Wesson .38 caliber nickel plated revolver;

d.  Three (3) Schlage solid brass deadbolt locks;

e.  Three (3) Schlage solid brass deadbolt door handles;

f.  10" slide compound mitre saw;

g.  Rigid tile saw with the stand;

h.  Hand-operated ceramic tile cutter;

i.  Black & Decker variable speed drill;

j.  Two (2) Milwaukee cordless drills in red plastic case;

k.  Milwaukee cordless skill saw;

l.  Ryobi Circular saw with laser;

m.  Rigid 10" table saw;

n.  Dremel compact circular saw;

o.  Milwaukee cordless reciprocating saw with two (2) batteries in a red bag; and

p.  Milwaukee reciprocating saw.

102.  Additionally, the Service Providers irreparably damaged, destroyed, or discarded multiple items from the subject property as follows:

a.  Aluminum security door damaged off frame by forced entry;

b.  Solid wood front door from forced entry;

c.  Two (2) solid wood rear doors damaged by "drilling-in" dead bolt locks and stealing the solid brass locks and solid brass handles (Florida room and Jacuzzi spa room);

    d.   Bi-fold door in master bedroom ripped off tracks with multiple louvers damaged;

    e.   Guest bathroom rack ripped off ceramic post, bar removed;

    f.   Custom vertical blinds in master bedroom ripped off windows and stolen;

    g.   Custom vertical blinds in home office ripped off windows and stolen;

    h.   All perishable meats, including lobster, shrimp, steak, chicken, fish, etc. stolen;

    i.   All foods, juices, condiments, jars in refrigerator stolen;

    j.   All meats and dishes cooked in Corning ware glass stored in the refrigerator thrown out, leaving the soiled Corning ware glass dishes on the countertop;

    k.   Vegetables cooked pots and pans stored in the refrigerator thrown out and large soiled Corning ware dishes, pots placed on countertops.

103.   At no point in time prior to the first or second break-in did any of the Defendants contact Plaintiff to ascertain whether he resided at the subject property or to receive his authorization to enter the subject property.  At no point did Plaintiff ever abandon the property.

104.   At no point in time did any of the Defendants or Service Providers obtain a court order granting them possession of the subject property.

105.   On May 17, 2013, Ms. Fonda Hancock, Plaintiff's immediate neighbor, called Plaintiff at work to inform him that the Defendants were breaking into his property *again*.

106.    While en route to his home on May 17, 2013, Plaintiff again contacted the DBPB
        to report the *second* break-in to his residence by the Defendants.

107.    By the time Plaintiff returned to his home on May 17, 2013, the Defendants had
        left the premises.  The Daytona Beach Police had also left the residence.  Plaintiff
        had been locked out of his home by the Defendants and could not open any door
        to enter his home.

108.    Moreover, to further add insult to injury, Nationstar *again* tacked on an additional
        $320.00 to the Plaintiff's existing mortgage balance for so-called "Property
        Preservation" fees to compensate the Service Providers for their May 17, 2013
        illegal break-in to Plaintiff's residence.

109.    Despite Plaintiff's demands, Defendants have failed to return, replace, or pay him
        the reasonable value of his property that they stole or discarded.

        Defendants' Attempted Break-In to Plaintiff's Home on May 25, 2013

110.    On May 25, 2013, Plaintiff was inside his bedroom when he heard someone
        attempt to open his front door by inserting a key in his deadbolt while
        simultaneously attempting to force the door open by using force while pressing
        the door handle and shaking the key.

111.    Plaintiff immediately retrieved his firearm and walked to his front door.  Plaintiff
        opened his door to find a Hispanic male wearing a Mortgage Solutions, Inc. golf
        shirt with a clip board and pen clinched under his arm.

112.    Plaintiff notified the MSI contractor to never attempt forced entry to his home
        ever again.  Plaintiff then instructed the MSI contractor to remain outside the

subject property while he closed the door to safely put away his firearm and retrieve his cell phone to call the police.

113.    Upon returning to the front door, Plaintiff inquired as to why the MSI contractor was at his home.   The MSI contractor was Roberto Villacis, from Kissimmee, Florida.   Mr. Villacis showed Plaintiff a work order from Nationstar, instructing MSI to secure pictures of all of the rooms within Plaintiff's home, as well as other tasks to be performed.

114.    Plaintiff again notified the MSI contractor that he was not in foreclosure and to never again attempt forced entry into his home before any court judgment of foreclosure.   Plaintiff then proceeded to contact the Daytona Beach Police while in the presence of the MSI contractor.

115.    Mr. Villacis informed Plaintiff that he did not need any trouble and asked Plaintiff if he could leave prior to the DBPD arriving, to which Plaintiff agreed upon receiving Mr. Villacis' work, residence, driver's license information, and tag number of Mr. Villacis' vehicle.

116.    Police arrived to Plaintiff's home and wrote a police report of the incident.

117.    The following day, Plaintiff again travelled to the Daytona Beach Police Headquarters to make another written complaint—this time against Nationstar Mortgage, LLC and Mortgage Solutions, Inc.

     Defendants' Attempted Break-In to Plaintiff's Home on May 27, 2013

118.   Two days later, on May 27, 2013, while Plaintiff was inside his home, Plaintiff heard what sounded like a commercial diesel truck standing with its engine running outside.

119.   To Plaintiff's disbelief, the noise came from Solomon and Dyson in their moving van, which was parked outside Plaintiff's home.

120.   Plaintiff immediately contacted the Daytona Beach Police.  While Plaintiff stood on his front porch to speak with the police, Solomon and Dyson made eye contact with Plaintiff, proceeded to laugh, and then departed the property.

121.   Once again, the following day, Plaintiff returned to the Daytona Beach Police Headquarters to file another written complaint against Solomon and Dyson.

## COUNT II: TRESPASS TO REAL PROPERTY
### (Against All Defendants)

122.   Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-121 by reference.

123.   At all times relevant, Plaintiff owned the subject property and had a legal right to possession of the subject property.

124.   Without consent or a right to possession, the Service Providers forcibly entered the subject property, changed the locks, disengaged the electricity, damaged the real property, and stole or removed Plaintiff's personal property.

125.   The Service Providers knew that Plaintiff owned and occupied the subject property along with his family, and nevertheless, the Service Providers acted with a reckless, willful, and conscious disregard for Plaintiff's property rights.

126.   The Service Providers' forced entry and trespass upon the subject property interfered with Plaintiff and his family's ownership, use, enjoyment, and possession of the premises.

127.   The Service Providers' forced entry and trespass upon the subject property caused Plaintiff and his family loss and damage to property, great harm, humiliation, distress, and suffering.

128.   It is the Service Providers' and Nationstar Mortgage, LLC's normal business practice to ignore the possessory and ownership rights of homeowners and withhold possession without obtaining a court order or searching the Recorder of Deeds to confirm rights to property.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

    a.   Enter judgment in Plaintiff's favor and against all Defendants;

    b.   Award Plaintiff actual damages in an amount to be determined at trial;

    c.   Award Plaintiff reasonable attorney's fees and costs; and

    d.   Award any other relief this Honorable Court deems equitable and just.

## COUNT III:  TRESPASS TO PERSONAL PROPERTY/CHATTELS
### (Against All Defendants)

129.   Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

130.   The Service Providers unlawfully entered the subject property and assumed dominion and control over Plaintiff's personal property and chattels without his consent and to the exclusion of his rights.

27

131.    All of the Service Providers' actions related to the forced entry and trespass upon the subject property caused Plaintiff and his family loss and damage to property, great harm, humiliation, mental distress, and suffering.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

a.   Enter judgment in Plaintiff's favor and against all Defendants;

b.   Award Plaintiff actual damages in an amount to be determined at trial;

c.   Award Plaintiff reasonable attorney's fees and costs; and

d.   Award any other relief this Honorable Court deems equitable and just.

<u>**COUNT IV:  CONVERSION**</u>
**(Against All Defendants)**

132.    Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

133.    The Service Providers, without authority or consent, stole Plaintiff's personal property.

134.    The Service Providers remain in unlawful possession of Plaintiff's personal property.

135.    Plaintiff has demanded the return of his personal property from the Service Providers.

136.    The Service Providers have made no attempt to replace or return Plaintiff's property, nor have the Service Providers offered to pay Plaintiff the equivalent monetary value of said property.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

a. Enter judgment in Plaintiff's favor and against all Defendants;

b. Award Plaintiff actual damages in an amount to be determined at trial;

c. Award Plaintiff reasonable attorney's fees and costs; and

d. Award any other relief this Honorable Court deems equitable and just.

## COUNT V:  INTRUSION UPON SECLUSION
### (Against All Defendants)

137. Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

138. Plaintiff and his family had a reasonable expectation of privacy within their home at the subject property.

139. The Service Providers intentionally and physically intruded upon the solitude and seclusion of Plaintiff and his family's private affairs without authority or express consent.

140. The Service Providers rummaged through Plaintiff's and his grandchildren's intimate personal belongings.

141. The Service Providers' acts of intrusion were highly offensive to Plaintiff, his family, and all like-minded reasonable individuals.

142. As a result, Plaintiff suffered extreme emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

a. Enter judgment in Plaintiff's favor and against all Defendants;

b. Award Plaintiff actual damages in an amount to be determined at trial;

c. Award any other relief this Honorable Court deems equitable and just.

**COUNT VI:  VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE**
**PRACTICES ACT (FDUTPA), FLORIDA STATUTES § 501.201, *et seq.***
**(Against Nationstar)**

143.   Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

144.   Plaintiff is a consumer, as defined under section 501.203(7), Fla. Stat.

145.   Defendant is engaged in commerce in the state of Florida with regard to Plaintiff and the subject property of the present action.

146.   Nationstar is not otherwise exempt under §501.201 et.seq., Fla. Stat.

147.   Moreover, Nationstar deceptively directed and induced Plaintiff to stop making monthly mortgage payments in 2012, and Nationstar subsequently attempted to illegally take possession of Plaintiff's home through the Service Providers after Plaintiff ceased making monthly payments, as directed by Nationstar.

148.   Nationstar retained the Service Providers who broke into Plaintiff's home and dispossessed Plaintiff of his personal property without any legal or factual basis.

149.   Nationstar unfairly locked Plaintiff out of his own property, used criminal intimidation in an attempt to force Plaintiff to abandon the possession of his own property, and attempted to criminally bully Plaintiff into a a self-help expedited non-judicial foreclosure.

150.   It is Nationstar Mortgage, LLC's normal business practice to ignore the possessory and ownership rights of homeowners prior to a foreclosure being filed or obtaining a court order for pre-judgment possession.

151.   Nationstar intended Plaintiff to rely on their deceptive and unfair acts, and Plaintiff did in fact rely on the Nationstar's deceptive and unfair acts to his detriment.

152.   Even after Nationstar was put on actual notice that Plaintiff in fact resided at his own home, Nationstar, in an act of sheer defiance, engaged the Service Providers to return multiple times for the solely to break into Plaintiff's home and subject property.

153.   Adding insult to injury, Nationstar subsequently and illegally charged Plaintiff with "property preservation" fees as well as "attorney's fees" and late fees to his mortgage, which constitute additional actual damages suffered by Plaintiff. Again, at no time material was Plaintiff's mortgage ever in foreclosure and no legal process was ever started by Nationstar against Plaintiff.  Plaintiff suffered actual damages as result of Nationstar's deceptive and unfair conduct by Nationstar asserting rights to attorney's fees and late fees where no legal action was initiated by Nationstar.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

a.   Enter judgment in Plaintiff's favor and against all Defendants;

b.   Award Plaintiff actual damages in an amount to be determined at trial;

c.   Award Plaintiff reasonable attorney's fees and costs pursuant to §501.2105, Florida Statutes; and

d.   Award any other relief this Honorable Court deems equitable and just.

## COUNT VII:  NEGLIGENCE
### (Against Field Asset Services and Dyson and Solomon)

154. Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

155. Defendants owed a duty to Plaintiff to use reasonable care in determining whether it possessed the legal right to forcibly enter Plaintiff's residence.

156. Defendants owed a duty to Plaintiff to exercise a reasonable degree of skill and care ordinarily employed by companies and individuals that perform similar work under similar and like conditions and circumstances.

157. Defendants breached its duty to Plaintiff in numerous ways, including but not limited to the following:

   a. Forcibly entering Plaintiff's residence without any legal authority and without reasonable notice;

   b. Forcibly entering Plaintiff's residence without Plaintiff's permission;

   c. Failure to make a reasonable determination on whether Nationstar had the legal authority to instruct it to enter Plaintiff's residence;

   d. Failure to fully investigate its legal authority to forcibly enter Plaintiff's residence; and

   e. Failure to determine whether Plaintiff's residence was abandoned before placing a sign in the window of the residence stating such.

158. FAS' breach of its duty harmed Plaintiff.

159. FAS' breach of its duty caused Plaintiff to suffer damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages, costs, and for any other relief this Court deems equitable and just, and Plaintiff demands a jury trial on all issues to which it is entitled.

**COUNT VIII:  NEGLIGENCE**
**(Against Nationstar Mortgage, LLC)**

160.   Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

161.   Defendant Nationstar Mortgage, LLC owed numerous duties to Plaintiff, including but not limited to the following:

   a.   A duty to use reasonable care in determining whether Plaintiff's residence was abandoned;

   b.   A duty to place Plaintiff on reasonable notice if Nationstar believed Plaintiff's residence to be abandoned;

   c.   A duty to properly evaluate and vet its contractors including FAS and any subcontractors, like Dyson and Solomon, before hiring it to perform an investigation or inspection of the residence;

   d.   A duty to seek a court order before it or one of its agents was given instructions to forcibly enter Plaintiff's residence;

   e.   A duty to make a determination of reasonable cause before directing FAS to perform an investigation or inspection of Plaintiff's residence;

   f.   A duty to properly supervise FAS and its subcontractors Dyson and Solomon after it was retained to perform the investigation or inspection of Plaintiff's residence; and

g. A duty to exercise a reasonable degree of skill and care ordinarily employed by mortgagers under like conditions and circumstances.

162. Nationstar breached its above mentioned duties to Plaintiff in numerous ways, including, but not limited to the following:

a. Failure to use reasonable care in determining whether Plaintiff's residence was abandoned;

b. Failure to place Plaintiff on reasonable notice if Nationstar believed Plaintiff's residence to be abandoned;

c. Failure to properly evaluate and vet its contractor, FAS, before hiring it to perform an investigation or inspection of the residence;

d. Failure to seek a court order before it or one of its agents was given instructions to forcibly enter Plaintiff's residence;

e. Failure to make a determination of reasonable cause before directing FAS to perform an investigation or inspection of the residence;

f. Failure to properly supervise FAS after it was retained to perform the investigation or inspection of Plaintiff's residence; and

g. Failure to exercise a reasonable degree of skill and care ordinarily employed by mortgagers under like conditions and circumstances.

163. Plaintiff has been harmed by Nationstar's breach of its duties.

164. Nationstar's breach of its duties have caused Plaintiff to suffer damages.

**WHEREFORE**, Plaintiff demands judgment against Nationstar for damages, costs, and for any other relief this Court deems equitable and just, and Plaintiff demands a jury trial on all issues to which it is entitled.

## COUNT IX:  BREACH OF CONTRACT
### (Against Nationstar Mortgage, LLC)

165.   Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

166.   To prevail on a breach of contract claim under Florida law, a plaintiff must show: (a) the existence of a valid and enforceable contract; (b) substantial performance by the plaintiff; (c) a breach; and (d) resulting damages.

167.   Plaintiff had a valid and enforceable mortgage contract with Nationstar Mortgage.

168.   Plaintiff substantially complied with the terms and conditions of the subject note and mortgage.

Nationstar's Breach of the Express Terms of the Subject Mortgage and Note

169.   Under the terms of the subject mortgage, Nationstar is required to comply with federal and state law.

170.   Florida law and the subject mortgage require that Plaintiff maintain exclusive possession to the subject property while he remains on title.

171.   The subject mortgage stipulated that Nationstar "may make *reasonable* entries upon and inspections of the Property" and "if it has reasonable cause, may inspect the interior of the improvements on the Property." The mortgage also states that Nationstar shall give Plaintiff notice at the time of or prior to such an interior inspection as well as specifying reasonable cause for doing so.

172.  Nationstar failed to take any steps to determine whether Plaintiff continued to occupy the subject property and whether the subject property was vacant or abandoned prior to directing the Service Providers to enter the subject property.

173.  Nationstar was on notice of the fact that Plaintiff had attempted to enter into a mortgage modification and had been specifically instructed by Nationstar to miss mortgage payments so as to induce a default status to trigger a more favorable outcome of mortgage modification.

174.  Nationstar breached the terms of the mortgage and note in addition to the implied covenant of good faith and fair dealing by failing to provide Plaintiff with reasonable notice of its intent to inspect and secure the property.  Furthermore, Nationstar failed to give Plaintiff any notice of interior inspection whatsoever prior to the April and May 2013 break-ins.

175.  Moreover, Plaintiff suffered erroneous late charges for the months of December 2016, January 2017, and February 2017, each of which are unwarranted, given the fact that Plaintiff made such mortgage payments to Nationstar in a timely manner.

176.  As a result of Nationstar's breaches, Plaintiff suffered damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

a.  Enter judgment in Plaintiff's favor and against Nationstar Mortgage, LLC;

b.  Declare that Defendant Nationstar Mortgage, LLC materially breached the mortgage contract;

c.  Award Plaintiff actual damages to be determined at trial;

     d.   Award Plaintiff reasonable attorney's fees and costs pursuant to the mortgage and note;

     e.   Award any other relief this Honorable Court deems equitable and just.

## COUNT X:  EQUAL RIGHTS VIOLATION UNDER 42 U.S.C. § 1981
### (Against All Defendants)

177.   Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

178.   Plaintiff Landon L. Williams is an American of African Ancestry.

179.   A contract exists between Plaintiff and Defendant Nationstar.

180.   On April 28, 2013, May 17, 2013, May 25, 2013 and May 28, 2013, the Defendants, through their illegal actions, acted both individually and in concert to interfere with Plaintiff's federally protected right to contract with Defendant Nationstar Mortgage, LLC.

181.   The individual defendants are Caucasian or are of European ancestry, whereas Plaintiff is an American of African ancestry.

182.   The Defendants' proscribed actions were motivated, in part, out of racial animus against Plaintiff.

183.   Furthermore, the Defendants' proscribed actions were motivated by a desire to terrorize, harass, and intimidate Plaintiff into abandoning his property. Nationstar routinely obtains a foreclosure judgement and writ of execution prior to conducting any interior property inspection of residences owned by a customer of Caucasian or European ancestry; whereas Nationstar did not obtain a foreclosure

judgement against the Plaintiff, nor did Nationstar ever obtain a court-ordered writ of execution prior to its multiple, successive break-ins of the Plaintiff's residence.

184.   The Defendants' individual and collective actions to materially interfere with Plaintiff's right to contract are extreme and outrageous and exceed the bounds of decency and civility.  To the Plaintiff's knowledge, there were no persons of Caucasian or of European ancestry subjected to any forced break-ins of their residences while being told by Nationstar loan representatives to remain delinquent on their Mortgage loans as a means to qualify for a hardship loan modification.

185.   As a result of Defendants' conduct, Plaintiff has suffered damages.

   **WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

   a.   Enter judgment in Plaintiff's favor and against all Defendants;

   b.   Award Plaintiff actual damages in an amount to be determined at trial;

   c.   Award Plaintiff reasonable attorney's fees and costs under 42 U.S.C. § 1988; and;

   d.   Award any other relief this Honorable Court deems equitable and just.

### COUNT XI:  ACTION FOR AN ACCOUNTING
**(Against Nationstar Mortgage, LLC)**

186.   Plaintiff incorporates the allegations contained in ¶¶ 2-20 and ¶¶ 57-122 by reference.

187.   This is an action for an accounting.

188.   Since Nationstar assumed the servicing of Plaintiff's mortgage, Nationstar has taken the liberty to impose unwarranted fees, surcharges, late charges, payment reversals, and other penalties on Plaintiff's mortgage.

189.   Most recently, Nationstar reversed Plaintiff's timely December 2016 mortgage payment a total of six (6) times before Nationstar choose to subtract Plaintiff's timely mortgage payment altogether.

190.   Plaintiff has suffered late fees, penalties, and other unwarranted charges as a direct result of Nationstar's inability to properly account for and apply Plaintiff's mortgage payments over the period of its mortgage servicing.

191.   Moreover, Plaintiff suffered late charges for the months of December 2016, January 2017, and February 2017, each of which are unwarranted, given the fact that Plaintiff made such mortgage payments to Nationstar in a timely manner.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

a.   Order a full and complete accounting of Plaintiff's mortgage payments with Nationstar Mortgage, LLC in addition to any other payments made to the mortgage for a reduction in principal by any other person;

b.   Award Plaintiff actual damages consisting of all fees, charges, and penalties improperly made by Nationstar to Plaintiff's mortgage account;

c.   Award Plaintiff reasonable attorney's fees and costs pursuant to the mortgage and note; and

d.   Award any other relief this Honorable Court deems equitable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can so be tried.

DATED this 6th day of October, 2017.

Respectfully submitted,

/s/ Maury L. Udell
Maury L. Udell, Esq.
FBN 121673
Attorney for Plaintiff
Beighley, Myrick, Udell & Lynne, P.A.
150 W. Flagler St., Suite 1800
Miami, FL 33130
Telephone:(305) 349-3930
Facsimile: (305) 349-3931
mudell@bmulaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 6th day of October, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record identified below in the manner specified, either via transmission of the Notice of Electronic Filing generated by CM/ECF or via U.S. Mail for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Maury L. Udell
Maury L. Udell, Esq.
FBN 121673
Attorney for Plaintiff
mudell@bmulaw.com

**SERVICE LIST**

Clinton S. Payne, Esq.
cpayne@hinshawlaw.com
Counsel for Field Asset Services

David Applegate, Esq.
David.applegate@akerman.com
Counsel for Nationstar Mortgage, LLC

Sami R. Achem, Jr.
Sami.achem@csklegal.com
Counsel for Mark Solomon & Dusten Dyson